MARIA CROCKER v. EDWARD M. WHITNEY.

THE NATIONAL BANK OF GENESEE, Appellant, v. HOMER
BOSTWICK, et al., Respondents.

Where the dealings between a bank and a customer were entered in a
single account, the latter being credited therein with the proceeds of
notes discounted, with drafts accepted, and moneys deposited; and
where, in accordance with the uniform custom of dealing, indorsed
notes of the customer discounted by the bank were charged to his
account as they matured, without protest, and were thereafter surren-
dered to the maker, *held*, that this was a payment, and that a mortgage
securing the payment of the notes was thereby discharged.

Under and by the provisions of the National Banking Act (§§ 8, 28), a
national bank is prohibited from taking a mortgage upon real estate,
except for debts contracted prior to the giving of the mortgage; and a
mortgage given to secure future indebtedness is void.

*It seems*, that a bank, in the absence of any restriction imposed by its
charter, may take a mortgage to secure anticipated liabilities, as well
as those existing at the time; but the Legislature, whose creation it is,
may impose such a restriction in its charter.

(Argued October 2, 1877; decided November 13, 1877.)

APPEAL by the National Bank of Genesee from an order
of the General Term of the Supreme Court, in the fourth
judicial department, affirming an order of Special Term
directing a disposition of surplus moneys.

This was an action of foreclosure. Judgment of fore-
closure and sale was perfected, and on sale thereunder a
surplus of $3,889.80 arose. Several parties filed claims to
this surplus, among others the said National Bank of Gene-
see, which claimed under a mortgage given by defendant
Whitney, dated January 12, 1871, for the sum of $5,000,
given, as stated therein, as collateral security for the pay-
ment of all notes of Whitney's at that time held by said
bank, "or for any other indebtedness now due, or may
hereafter become due." The respondents herein, Homer
Bostwick and E. M. McCormick, claimed under mortgages
subsequent to that of said bank.

SICKELS.—VOL. XXVI.   21

The referee, to whom it was referred to ascertain as to the liens on such surplus and their priority, reported, among other things, that at the time of the giving of the bank mortgage, Whitney was indebted to the bank in the sum of $3,200, which sum was thereafter paid; and, as conclusion of law, that the mortgage was only valid as a security for an indebtedness existing when it was given, and by such payment it was extinguished; and he therefore decided that the other claimants were entitled to the surplus.

Further facts appear in the opinion.

*William C. Watson*, for the appellant. The credits to Whitney would be applied to his unsecured, instead of his secured indebtedness. (*Lysaght* v. *Walker*, 5 Bligh [N. S.], 1; *Field* v. *Holland*, 6 Cranch, 8–27; 15 Wend., 29; *Blanten* v. *Rice*, 5 Mon., 258; 1 Am. L. Cas., 271–283; *Robinson* v. *Doolittle*, 12 Vt., 246; *Emery* v. *Tickout*, 13 id., 15–17; *Langdon* v. *Bowen*, 46 id., 512; *Chester* v. *Wheelwright*, 15 Conn., 562; *Allen* v. *Culver*, 3 Den., 284.) The action of the appellant in taking the mortgage was not *ultra vires*. (*Trenton B'kg. Co.* v. *Woodruff*, 1 Green. [N. J.] Ch., 117; A. & A. on Corp., chap. 5, § 1; Green's Brice's *Ultra Vires;* *Manning* v. *Mosc. Presb. Soc.*, 27 Barb., 52; *Allen* v. *Flint Nat. Bank*, 23 Ohio St., 97–104; *Shinkle* v. *First Nat. Bank of Ripley*, 22 id., 516–524; 2 Kent's Com., 238; 4 Wheat., 546; 4 Hill, 443; *Barry* v. *Mer. Ex. Co.*, 1 Sand. Ch., 280; *Curtis* v. *Leavitt*, 15 N. Y., 64, 65; *Silver Lake Bank* v. *North*, 4 J. Ch., 370; *Steamboat Nav. Co.* v. *Weed*, 17 Barb., 378; *O'Hare* v. *Nat. Bank of Albany*, 2 Alb. L. J., 71; *Parish* v. *Whalen*, 22 N. Y., 494–508.) The appellant's mortgage is prior, and should be preferred to either that of Bostwick or McCormick, and is valid. (1 Edmds. Stats. at Large, 707, 714, 737; *Pickett* v. *Barros*, 26 Barb., 505; *Webster* v. *Sternbergh*, 46 id., 211; *Merritt* v. *N. R. R. Co.*, 12 id., 615; *Nat. Bank of Topeka* v. *Rowell*, 2 Dillon, 371.)

*M. H. Peck*, for respondents. The appellant's mortgage was void under the provisions of the National Banking

Act. (N. S. R. S., 999, §§ 5136, 5137; Act of June 3, 1864, §§ 8, 28, sub. 7; *Nat. Bank of Topeka* v. *Rowell,* 2 Dil., 371; *Ripley* v. *Harris,* 3 Bissell, 199.) The first payments by Whitney operated as a payment and satisfaction of the appellant's mortgage. (*Truscott* v. *King,* 6 N. Y., 147; *Mead* v. *York,* id., 449; *Sheppard* v. *Steele,* 43 id., 52; *Bank of Albion* v. *Burns,* 46 id., 170.)

ANDREWS, J. The National Bank of Genesee, on the 12th day of January, 1871, when the mortgage from Whitney was executed, held his indorsed paper, which it had previously discounted for him to the amount of $3,200. The mortgage was given to secure this indebtedness, and also any debts of the mortgagor to the bank, which might thereafter be contracted. It is conceded that the mortgage was a valid security for the notes, held by the bank at its date; but it is claimed, and the referee has found, that these notes were subsequently paid, and unless the bank is entitled to have this finding set aside, its right to the surplus money arising on the sale under the judgment in this action, will depend upon the question of the validity of the mortgage, under the provisions of the National Bank Act of June 3, 1864, regarding it as a mortgage to secure future loans or discounts. If valid in that view, the right of the bank to priority of payment out of the fund is conceded; but the respondents, who are mortgagees of Whitney subsequent to the bank, contest the validity of the bank mortgage as a security for future liabilities; and reposing upon the claim that it was invalid as a security for debts thereafter contracted and the finding of the referee, that the debts owing by Whitney to the bank at the date of the mortgage, have been paid, they insist that they are entitled to have the surplus money applied upon their mortgage, and that the claim of the bank thereto should be rejected. The appellant claims that the finding that the indebtedness of Whitney to the bank, at the date of the mortgage, was paid, is not sustained by the evidence, and that, in fact, it entered into and forms a part of the debt of $5,160.10

now owing by Whitney to the bank, represented by his note for that amount of June 18, 1874; and it further claims that if the original debt is regarded as paid, the mortgage, nevertheless, is an authorized and valid security, under the National Bank Act, for the debt of Whitney to the bank, incurred after it was executed.

We are of opinion that, upon the facts proved, the notes of Whitney held by the bank when the mortgage was given were paid, and that the referee was amply justified in his conclusion upon that question. Whitney was a miller, and manufactured flour for sale. He was a dealer with the bank. The bank discounted his notes, and passed the proceeds to his credit on its books. He drew drafts on his customers, which the bank received and credited to him, and he deposited in the bank money received in his business. The items of credit and debit were entered in a single account, and it was the usual and, so far as appears, the uniform practice that, when his notes matured, they were charged in his account, and afterwards surrendered. The notes held by the bank January 12, 1871, according to the usual custom, were not protested, but as they matured were charged to his account, and afterwards surrendered; and his credit on the books of the bank, made up of this blended fund, derived from discounts, drafts, and deposits, was reduced to the extent of the paper charged against it. There was no indorser on the notes discounted after January 12, 1871. They were discounted on the credit of Whitney, and in reliance on the mortgage. The debit side of the account from January, 1871, to August, 1874, amounted to $171,175.82, and the credits to $168,237.51. It is, we think, a clear proposition, in view of these facts, that the notes held by the bank in January, 1871, were paid. The credits to Whitney were applied to the payment of the notes as they matured. There is no other inference to be drawn from the acts of the bank. If the notes were not deemed to be paid, why were the indorsers discharged, and the notes given up? It was not the case of a mere renewal

of notes. The transaction does not differ in legal effect from what it would have been, if Whitney, having funds in the bank, had, as each note matured, drawn his check upon the bank for the amount, and delivered it to the bank, and the bank had received it and charged it to his account, and then surrendered the note. We deem it unnecessary to consider the rule for the application of payments, when neither party have made the application. In this case there was, by force of the transaction and the manner of keeping and dealing with this account, an appropriation of the credits *pro tanto*, to pay the maturing notes, by the consent of both debtor and creditor; and this, in law, was payment. The consent is inferable from the manner in which the business was conducted. There is no ground for the inference that the bank intended to keep alive the debt existing when the mortgage was given, for it is evident that it relied upon the mortgage as a valid security for the final balance of the account, and for debts which might be contracted after its execution, as well as those existing at that time. We conclude, therefore, that the finding of the referee, that the bank-debt owing by Whitney when the mortgage was given was afterwards paid, cannot be disturbed. (See *Clayton's Case*, 1 Mer., 608; *Truscott v. King*, 6 N. Y., 147.)

We come, then, to the remaining question in the case, viz., whether national banks are prohibited by the National Bank Act of June 3, 1864, from taking a mortgage on real estate as security for loans or discounts, which the bank may thereafter make to the mortgagor. The business of a banking corporation necessarily involves the making of contracts, the loaning of money, and the existence of the relation of creditor and debtor between the bank and its customers. A corporation has, incidentally, at common law—in the absence of any restriction imposed by its charter, or implied from the nature and objects of the incorporation—the power to take and hold real estate, and may deal in respect to it to the same extent as a natural person. (2 Kent, 281; Ang. & Ames on Corp., § 145.) A banking, business, or trading

corporation, having the right to make contracts and to become creditors, may secure its debts by taking a mortgage on real estate, or in any way provided for by the convention of the parties; and we see no reason to doubt that a bank, unless restrained by its charter, may take a mortgage to secure anticipated liabilities, as well as those existing at the time. This is a convenient and ordinary method, when a continuous dealing upon credit is contemplated, of securing the final indebtedness. But the Legislature, by whose fiat the corporation exists, and whose creation it is, may prescribe and regulate the mode of its operation, and in what manner its powers shall be exercised. It may, by special restriction in the charter, define and limit the incidental powers which the corporation shall possess; and so far as this is done, the statute, and not the common law, will determine what those powers are. (*Bank U. S.* v. *Dandridge*, 12 Wheat., 64; *Head* v. *Prov. Ins. Co.*, 2 Cranch, 127.)

It follows, from this familiar doctrine in respect to the powers of corporations, that in the absence of any restriction in the National Bank Act upon the power of national banks to take mortgages on real estate to secure future loans or discounts, the power to do so cannot be successfully challenged, and those who deny that the power exists must show that its exercise is prohibited or restrained by the statute under which the banks are organized. We come, then, directly to the consideration of this question.

The eighth section of the National Bank Act specifies the banking powers of institutions organized under it, viz.: "To carry on the business of banking, by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security, and by obtaining, issuing, and circulating notes according to this title;" and they are especially authorized to exercise all such incidental powers as shall be necessary to carry on the business of banking. The words "personal security," used in the section, are manifestly used

in contradistinction to real security, and define the description of securities upon which loans by national banks may be made. Loans upon individual credit, or upon the pledge or security of personal property, are within the description; but a loan made upon a real estate mortgage is a loan upon real security, whether the mortgage is regarded as conveying to the mortgagee an estate in the land, as in some of the states, or as creating a lien simply to be enforced by foreclosure and sale, as in this. This specification of the banking powers of national banks is nearly identical with the specification in the general banking law of this State of 1838. It differs in this: under our State law, among other powers specified, was this "loaning money on real and personal security." The change in the National Bank Act—which was framed, doubtless, with knowledge of the provisions of our State law—is significant of the intention of Congress to restrict national banks to loaning upon personal, as distinguished from real, security.

If the argument upon the point we are considering rested solely upon the language of the eighth section of the National Bank Act, it might be plausibly urged that the authority to loan on personal security being specified, a prohibition was implied against loaning on real security, and that upon this ground alone the mortgage in question could not be held a valid security for Whitney's debt to the bank, contracted after the mortgage was given. Upon this point the language of Chief-Justice THOMPSON, in *The People* v. *Utica Ins. Co.* (15 J. R., 383), where the point was whether the insurance company could, under its charter, exercise banking powers, is suggestive. He says: "The specification of certain powers operates as a restraint to such objects only, and is an implied prohibition of the exercise of other and distinct powers." And in *N. Y. Firemens' Ins. Co.* v. *Ely* (2 Cow., 678), SUTHERLAND, J., referring to the claim that the company was not prohibited from investing its surplus funds in loans upon promissory notes, said: "The sixteenth section of the act expressly provides that it shall be lawful for the corporation to invest their capital, or any portion of it, either in

the stock of the United States, or of the individual States; thus, by the strongest implication, prohibiting any other mode of investment, and destroying the inference which might have resulted from the absence of all regulations on the subject." But we are not required to decide, in this case, whether the taking of a mortgage by a national bank to secure future loans is prohibited by the true construction of the eighth section of the act, standing alone; but a reference to the twenty-eighth section of the act, in connection with the eighth section, makes it very clear that it was the intention of Congress to prohibit the taking, by a national bank, of a real estate mortgage for that purpose. That section is as follows: " It shall be lawful for any such association to purchase, hold, and convey real estate for the following purposes, and for no others: First. Such as shall be necessary for its immediate accommodation in the transaction of its business. Second. Such as shall be mortgaged to it in good faith, by way of security for debts previously contracted. Third. Such as shall be conveyed to it in satisfaction of debts previously contracted in the course of its dealings. Fourth. Such as it shall purchase at sales under judgments, decrees, or mortgages held by the association, or shall purchase to secure debts due to it. But no such association shall hold the possession of any real estate under mortgage, or the title and possession of any real estate purchased to secure any debts due to it, for a longer period than five years."

It is apparent, on reading this section, that it was the intention of Congress to enable national banks to acquire real estate for a bank building and accommodations, and in payment of, or to secure debts existing when the title was acquired, and to prohibit them from purchasing or holding lands under any other circumstances. The second specification must be construed as prohibiting the taking of a mortgage as a security, except for debts previously contracted — i. e., contracted before the mortgage was given. It has no other reasonable or sensible meaning, and this meaning is in harmony with the general object of the section,

which was to prevent national banks from having their capital tied up in real estate investments or securities. The usefulness of the banks in aiding the business of the country depends, to a great extent, upon the mobility of their capital, and the readiness with which it can be turned and employed in aid of commerce; and the dangers to which, in the view of Congress, the banking system would be exposed by an unlimited power to the banks to loan their funds on real estate securities, may have led to the prohibition in question. The closing paragraph of the section indicates also, perhaps, a mortmain policy, as in the view of Congress; although I apprehend the limit of five years, beyond which the banks are prohibited from holding real property as mortgagee in possession, or the title of real estate purchased to secure debts, was mainly designed as an additional guard against the withdrawal of bank capital from active use by investments in real estate. The suggestion that a bank, by taking a mortgage on lands in this State, is not a holder of the lands mortgaged, and has no estate therein, and is, therefore, not within the prohibition against holding lands by mortgage to secure future loans, is specious, but not, we think, sound. The intention of Congress in passing the bank act was to provide for the creation of banking corporations throughout the Union, with uniform organization and powers. It was not intended to allow national banks in one State to take mortgages to secure future loans, and to prohibit banks in another State from doing so, depending upon the nature and character of a mortgagee's interest in the land as defined by the laws of different States. The bank becomes a holder of real estate by taking a mortgage thereon, within the true meaning and intendment of the twenty-eighth section of the act.

Having reached the conclusion that the National Bank of Genesee was prohibited from taking a mortgage of real estate, except to secure a pre-existing indebtedness, the further conclusion seems to follow, that the mortgage from Whitney cannot be enforced. It was not, at the time of the sale upon which the surplus moneys were realized, a subsist-

ing, valid lien upon the land; and as the equity of redemption was not bound by the mortgage, the bank had no claim upon the surplus moneys. It is a settled principle, that the courts will not enforce a contract, the subject-matter of which is either *malum prohibitum* or *malum in se*. A contract made in violation of a statute is void, and it is immaterial that it is not so declared in the statute itself. The law adjudges it to be so, and courts do not undertake to pass upon the wisdom of the policy of the Legislature in enacting prohibitory statutes. Our attention has been called to the case of *The Silver Lake Bank* v. *North* (4 J. Chy., 370.) The statute under consideration, in that case, as the chancellor construed it, did not prohibit the taking of the mortgage by the bank. There is no room, we think, in this case, to doubt, upon the language of the bank act, that it was the intention of Congress to prohibit banks taking a mortgage on lands to secure future advances; and this being so, a security taken for such a purpose is void, within numerous authorities. (*North River Ins. Co.* v. *Lawrence*, 3 Wend., 482; *Life and Fire Ins. Co.* v. *Merchants' F. Ins. Co.*, 7 id., 31; *N. Y. Ins. Co.* v. *Ely*, 2 Cow., 678; *Bank of Salina* v. *Alvord*, 31 N. Y., 473, and cases cited.)

The construction we have given to the twenty-eighth section of the National Bank Act, is supported by the following cases: *Fowler* v. *Scully* (72 Pa., 456); *National Bank of Topeka* v. *Rowill* (2 Dillon [C. Ct. R.], 371; *Ripley* v. *Harris* (3 Bis. [id.], 190.)

The order should be affirmed.

All concur, except RAPALLO, J., not voting, FOLGER, J., absent.

Order affirmed.